# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs January 4, 2018

## STATE OF TENNESSEE v. JAMIE CROWELL

**Appeal from the Circuit Court for Chester County**
**No. 15-CR-61      Roy B. Morgan, Jr., Judge**

_____

### No. W2017-00799-CCA-R3-CD

_____

The Defendant, Jamie Crowell[1], was convicted by a Chester County Circuit Court jury of aggravated kidnapping, a Class B felony; facilitation of aggravated assault, a Class D felony; possession of methamphetamine with intent to sell, a Class B felony; possession of methamphetamine with intent to deliver, a Class B felony; possession of a Schedule II controlled substance, oxymorphone, a Class A misdemeanor; and possession of drug paraphernalia, a Class A misdemeanor. The trial court merged the methamphetamine convictions into one conviction and sentenced the Defendant to a total effective term of seventeen years in the Tennessee Department of Correction. On appeal, the Defendant argues that: (1) the evidence is insufficient to sustain his convictions; (2) the State's questioning about the prior methamphetamine use of defense witnesses denied him a fair trial; and (3) the trial court imposed an excessive sentence. After review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and CAMILLE R. MCMULLEN, JJ., joined.

Terry Lee Dicus, Jr., Savannah, Tennessee, for the appellant, Jamie Crowell.

Herbert H. Slatery III, Attorney General and Reporter; Zachary T. Hinkle, Assistant Attorney General; Jody S. Pickens, District Attorney General, for the appellee, State of Tennessee.

_____
[1] The Defendant spells his name Jamey in his appellate brief.

# OPINION

## FACTS

The Defendant and two co-defendants, Daryl Gatley and Dustin McCollum, were indicted for especially aggravated kidnapping; aggravated assault; possession of a prohibited weapon[2]; possession of methamphetamine with intent to sell or deliver; possession of a Schedule II controlled substance, oxymorphone; and possession of drug paraphernalia.

### State's Proof

At trial, the victim, Gail Pearson, testified that she had known the Defendant "[a]ll his life." In early July 2015, Ms. Pearson loaned her car to her son, co-defendant Dustin McCollum, and the Defendant, who was with Mr. McCollum at the time. The two were gone with her car for "[a]t least four, maybe more" days, even though she had only loaned it to them to get oil for the Defendant's truck. Ms. Pearson admitted that she initially wrote a statement suggesting that they had the car for two days but maintained they had it for at least four days.

Ms. Pearson recalled that on July 9, 2015, while Mr. McCollum and the Defendant were still gone with her car, Mr. McCollum called her and asked if she would fix him and the Defendant something to eat. The two men arrived to her house around 6:30 that night and again asked if she would fix them something to eat. The Defendant had "a long gun . . . [that] [h]ad a stand" with him. While Ms. Pearson was preparing the food, Mr. McCollum and the Defendant napped on the couch. At that time, the Defendant's gun was seven or eight feet away from him, but Mr. McCollum had a pistol tucked in the waistband of his pants. When she was finished preparing the food, Ms. Pearson woke the men up and they ate. The Defendant had asked Ms. Pearson to take him home, but he ended up eating the food she had prepared instead of going home.

Mr. McCollum asked to use Ms. Pearson's phone and "started going through" it. He asked her about a "special agent so-and-so" in her contact list, and she tried to explain that it referred to her son-in-law who was a "Sergeant First Class" in the Army. Mr. McCollum then accused Ms. Pearson, his ex-wife Maley, and a person named Derrick Maness of conspiring against him to get him into trouble, which Ms. Pearson denied.

Ms. Pearson acknowledged that in her statement to police, she told the officers that, during his rant, Mr. McCollum accused the Defendant of "do[ing] him wrong." She

---

[2] The State dismissed the possession of a prohibited weapon charge prior to trial.

said that she was traumatized at the time and not sure why she said that because Mr. McCollum and the Defendant "came in as friendly as they always had been." However, she recalled that Mr. McCollum told her that he had to drive an "old rattletrap" back from Alabama and the Defendant "drove the good vehicle," which Mr. McCollum said "was just wrong."

Mr. McCollum put a pistol to Ms. Pearson's head, saying he would help her remember the conspiracy against him and "clicked" the trigger. Mr. McCollum ordered Ms. Pearson onto the couch in the living room, but she was able to grab her "Safe Link" phone without him noticing. At this point, the Defendant was sitting on the couch in the living room and his gun was by the couch.

Mr. McCollum told Ms. Pearson she "better start remembering" the conspiracy against him or he would "shoot [her] kneecaps off." The Defendant laughed when Ms. Pearson began to beg Mr. McCollum not to shoot her. Mr. McCollum continued to argue with Ms. Pearson, eventually telling her that he was going to have to kill her. However, Mr. McCollum said that he would do it in "a little bit" and walked into the kitchen to call co-defendant Daryl Gatley. He told the Defendant not to let Ms. Pearson "do anything stupid." The Defendant did not say anything but remained sitting on the couch with his gun.

Ms. Pearson recalled that Mr. Gatley arrived a short while later and gave Mr. McCollum a knife. Mr. McCollum told Ms. Pearson that he should cut out her tongue and then put the knife to her ear, saying he was "gonna cut through [her] jawbone and [her] teeth and scar [her] face." After she begged him not to do that, he put the knife away.

Ms. Pearson tried to call 911 from her "Safe Link" phone but could not get a signal out. At some point, she was able to call her sister, Elizabeth Ann Pugh, while she was "praying . . . [and] all curled up" under a comforter. She left Ms. Pugh a voicemail asking her to call the police and explaining that the defendants were "fixing to kill [her]." She did not know if the Defendant did not hear her or was ignoring her. She called Ms. Pugh again and left the line open.

Ms. Pearson recalled that the defendants had a conversation about how to kill her and what to do with her body. The Defendant urged Mr. McCollum to "[h]urry up and . . . get this done" because they had "places to go and things to do." Mr. Gatley and the Defendant asked Mr. McCollum what he was going to do, inquiring "You gonna cut her up? You gonna cut her head off? We gonna burn her in the house or what?" The men noted that there were items in the house they could use to set it on fire. All three of the men were armed. Ms. Pearson said that the Defendant actually pointed his gun at her at

some point during the ordeal, although in her statement to the police and at the preliminary hearing she had not mentioned the Defendant doing so.

At some point, officers from the sheriff's department arrived and ordered that the defendants come out with their hands raised. The Defendant and Mr. Gatley grabbed their guns and went to the back room, but Mr. McCollum stayed with Ms. Pearson in the living room. Ms. Pearson convinced Mr. McCollum to let her go outside and tell the officers that everything was okay. Once Ms. Pearson was outside, the officers called the defendants out one-by-one.

The officers searched Ms. Pearson's vehicle at the scene and found various drugs. Ms. Pearson said that the items did not belong to her and reiterated that Mr. McCollum and the Defendant had been in possession of her car the four days leading up to the offense. She denied that she had been back in the car before the officers searched it.

Ms. Pearson said that the duffle bag found in her car that contained women's and men's clothing, makeup, a tin can, and other items did not belong to her. She said that it also did not belong to Mr. McCollum because she knew what his clothes looked like. Mr. McCollum told her that the drugs found in the car did not belong to him.

Elizabeth Ann Pugh, Ms. Pearson's sister and Mr. McCollum's aunt, testified that she had known the Defendant "[s]ince he was baby," as he and Mr. McCollum had always been friends. Around 11:30 p.m. on July 9, 2015, she was asleep in bed when she received a series of phone calls from her sister. Ms. Pugh let the first call go to voicemail but answered the second call. Ms. Pearson did not say anything during the call; however, she left the line open and Ms. Pugh could hear the background conversation. Ms. Pugh heard "a lot of commotion between two guys" discussing what they were going to do to Ms. Pearson. She recognized the voices as Mr. McCollum's and Mr. Gatley's, and then she heard a third voice at the end of the call that she recognized as the Defendant's. She recalled that Mr. McCollum and Mr. Gatley discussed setting the house on fire and then she specifically recalled hearing the Defendant say, "Yes, we've got to get this done right now. We've got to get this over with." Ms. Pugh called 911.

Deputies Celinda Davidson, Nathan Daniel, and Kyle Connor with the Chester County Sheriff's Department arrived to the scene between midnight and 1:00 a.m. on July 10, 2015, in response to a call that Ms. Pearson was being held against her will. The officers demanded that the victim be sent outside. Ms. Pearson walked out with her hands raised, and the officers patted her down. The officers then ordered the defendants to come out one-by-one, and all were taken into custody.

- 4 -

After the defendants were arrested, the officers swept the house and found a loaded nine-millimeter pistol "on a shelf just outside the living room going into the hallway," a rifle and muzzleloader in the hallway closet, and a sawed-off shotgun and another muzzleloader in the back bedroom closet. Officers also searched Ms. Pearson's vehicle upon learning that it had been in Mr. McCollum's and the Defendant's possession. They found nine-millimeter caliber ammunition in the cupholder of the car and three empty rifle casings in an ammunition box found on the front passenger side floorboard. In the back seat, they found a male's toiletry bag with a tin can inside of it that was surrounded by male camouflage clothing. The tin can contained two clear baggies of a white rock substance that field-tested positive for methamphetamine, fourteen pills, and a syringe. Deputy Davidson did not recall seeing any name associated with the bag, female clothes, or Suboxone strips in the bag.

Deputy Connor filled out the police report and spoke with Ms. Pearson. Ms. Pearson told Deputy Connor that the Defendant and Mr. McCollum had argued at one point. However, Deputy Connor also remembered Ms. Pearson saying that the Defendant had a rifle and that all three defendants talked about killing her. Deputy Connor transported the Defendant to jail and $2,616 in cash was found on him during the booking process. The Defendant indicated to the jailer that he was unemployed.

Agent Brock Sain, a forensic scientist with the Tennessee Bureau of Investigation, analyzed the substances submitted in the case and determined that the white rock substance was 22.49 grams of methamphetamine and the fourteen pills were oxymorphone.

Deputy Steve Davidson with the Chester County Sheriff's Department testified that he had worked in narcotics investigation for a number of years and was therefore familiar with the illegal drug market. At the time of the incident, methamphetamine was worth around $100 per gram and, based upon that value, 22.5 grams of methamphetamine would be worth around $2,250. Deputy Davidson stated that packaging the methamphetamine in two different bags could be an indication of intent to sell or deliver, and the quantity recovered in this case was more than what was typical for personal use.

**Defendant's Proof**

Jimmy Crowell, the Defendant's father, testified that he loaned the Defendant $800 around July 4, 2015, because the Defendant wanted to purchase a vehicle.

Jennifer Lee, who dated the Defendant around the time of the offense and had known him for several years, testified that she let the Defendant borrow $1,000 to buy a vehicle. Ms. Lee admitted that she worked a minimum wage job at the time of the

offense and lived with her ex-husband, but she claimed that she had saved $1,000 and gave it to the Defendant "[o]ut of the kindness of [her] heart." Asked if she used methamphetamine, Ms. Lee answered in the negative, but she admitted that she had used it "[y]ears and years ago" in "2009, 2010."

Stewart Grooms, a friend of the Defendant's and Mr. McCollum's, testified that both men showed up at his house around 2:30 p.m. the day of the incident. Mr. Grooms recalled that, when they arrived, Mr. McCollum was "mad about something" and "had a wild look in his eyes." Mr. McCollum had a gun in his lap. When the Defendant got out of the car to relieve himself, Mr. McCollum "jump[ed] out of the car," pointed his gun at the ground, "click[ed]" it, and said, "Don't think about running." Mr. Grooms invited the men inside his home and tried to calm Mr. McCollum down. He noted that Mr. McCollum seemed to be angry with the Defendant and was "real temperamental acting." Mr. McCollum pointed his gun at his own head as he and the Defendant were leaving. Mr. Grooms did not see the Defendant with a gun.

Holly Melton testified that she had "been best friends" with the Defendant "for years" and he was living with her at the time of the incident. Early on the day of the offense, Ms. Melton saw Mr. McCollum with the Defendant and observed that Mr. McCollum "had some kind of craziness in his head thinking that his mom and his wife and his half-brother were trying to kill him," and the Defendant was trying to help him through those issues. Ms. Melton recalled that Mr. McCollum had on camouflage and face paint, and he followed the Defendant around everywhere with a rifle. Ms. Melton said that she never saw the Defendant with a gun, camouflage clothing, a duffle bag, or a tin can. When asked, Ms. Melton surmised that the Defendant could have come into possession of the large amount of money found on him because he had been helping her boyfriend with some remodeling projects. On cross-examination, Ms. Melton said that she last used methamphetamine three or four years ago, which was "before all this happened."

Alana Pangborn testified that she met Ms. Pearson a couple of weeks after the offense, and Ms. Pearson told her that the Defendant did not have a gun in his possession on the day of the offense.

Daryl Gatley, one of the co-defendants, admitted that he pled guilty to kidnapping and aggravated assault before trial. Mr. Gatley stated that the Defendant "was just sitting on the couch" when he arrived at Ms. Pearson's house. He did not see the Defendant with a firearm at any time but recalled that there was a rifle leaning against the wall close to the couch where the Defendant was sitting, within an arm's reach. Mr. Gatley said that both he and Mr. McCollum were armed. Mr. Gatley did not recall the Defendant make any statements to Ms. Pearson or do anything that suggested Ms. Pearson could not leave.

Mr. Gatley admitted that there was no indication that the Defendant was being held against his will or forced to do anything. Mr. Gatley also admitted that he had been using methamphetamine at the time and had been awake for three or four days, which compromised his ability to perceive or remember things.

The Defendant testified that Mr. McCollum took him to Ms. Pearson's house around 6:00 p.m. on the night of the incident, and the two of them napped as Ms. Pearson cooked dinner. While Mr. McCollum was still asleep, the Defendant asked Ms. Pearson to take him home because Mr. McCollum "was out of his mind." Ms. Pearson awoke Mr. McCollum to tell him that she was going to take the Defendant home, but Mr. McCollum pulled out a pistol and told Ms. Pearson "no, she wasn't gonna carry [the Defendant] home, he would carry [him] home when he got ready to[.]" The Defendant sat down on the couch to eat dinner and, between then and when the police arrived, the only time he got up was to put his plate away. When Mr. Gatley arrived, Mr. McCollum told him to "cover" the Defendant, and Mr. Gatley put his shotgun to the Defendant's head. The Defendant said that he never threatened Ms. Pearson or had a gun that night.

The Defendant claimed that the reason he did not flee when Mr. McCollum was asleep was because he wanted to get Ms. Pearson out of the house and tell her what all had happened leading up to that point. The Defendant elaborated that Mr. McCollum had held him at gunpoint all day, from the moment he woke up. He recalled that Mr. McCollum told him that he was off his medication and needed to call his doctor. After they called the doctor, Mr. McCollum "got to thinking everybody in the house was trying to kill him." Mr. McCollum wanted to kill everyone in the house, but the Defendant convinced him to leave. While they were driving down the road, Mr. McCollum pulled out a pistol and fired a shot over the Defendant's head, asking if the Defendant had been paid by Derrick Maness to kill him. Mr. McCollum pulled a gun on him and refused to let him leave several times throughout the day.

The Defendant denied knowing about the methamphetamine found in the car and claimed the duffel bag belonged to Mr. McCollum. The Defendant said that the cash he had on him was money to buy a car, much of which had been loaned to him.

Asked about his knowledge of prior methamphetamine use by Holly Melton and Jennifer Lee, the Defendant admitted to seeing Ms. Melton use methamphetamine in his presence in 2009 or 2010 and to knowing that Ms. Lee "used to be a meth user."

Following the conclusion of the proof, the jury convicted the Defendant of the lesser-included offenses of aggravated kidnapping and facilitation of aggravated assault and, as charged, of possession of methamphetamine with intent to sell or deliver, possession of a Schedule II controlled substance, and possession of drug paraphernalia.

## ANALYSIS

## I. Sufficiency

The Defendant argues that the evidence is insufficient to sustain his aggravated kidnapping and drug convictions. He does not challenge his conviction for facilitation of aggravated assault.

When the sufficiency of the evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court has stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 405 S.W.2d 768, 771 (Tenn. 1966) (citing Carroll v. State, 370 S.W.2d 523 (1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing State v. Brown, 551 S.W.2d 329, 331 (Tenn. 1977); Farmer v. State, 343 S.W.2d 895, 897 (Tenn. 1961)). The standard of review for

sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. State v. Campbell, 245 S.W.3d 331, 335 (Tenn. 2008) (citing Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence and the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence are questions primarily for the jury. Dorantes, 331 S.W.3d at 379 (citing State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006)). This court, when considering the sufficiency of the evidence, shall not reweigh the evidence or substitute its inferences for those drawn by the trier of fact. Id.

The Defendant asserts that the evidence did not support his aggravated kidnapping conviction because he merely "sat quietly on the couch and never spoke to the victim" or "restrained the [v]ictim's movement at all." To sustain the conviction for aggravated kidnapping, the State had to prove that the Defendant knowingly removed or confined Ms. Pearson unlawfully so as to interfere substantially with her liberty "[w]hile [he] [wa]s in possession of a deadly weapon or threaten[ed] the use of a deadly weapon." Tenn. Code Ann. §§ 39-13-302(a); -304(a)(5). Viewing the testimony in the light most favorable to the State, Ms. Pearson testified that she did not feel free to leave after Mr. McCollum ordered the Defendant not to let her do anything "stupid," and the Defendant pointed his gun at her during the ordeal and was involved in a discussion with his co-defendants about killing her. Ms. Pugh confirmed that she heard the Defendant actively engaged in the discussion with his co-defendants about how to kill Ms. Pearson. Although the Defendant offered testimony that he was not an active participant, the jury was not required to accredit that testimony. The evidence is sufficient to sustain the Defendant's conviction for aggravated kidnapping.

The Defendant also argues that the evidence is not sufficient to support his drug convictions because the State failed to establish that he possessed the drugs and drug paraphernalia in the car. He does not challenge the proof establishing the other elements of the offenses. Possession of drugs may be constructive as well as actual. State v. Shaw, 37 S.W.3d 900, 903 (Tenn. 2001); State v. Transou, 928 S.W.2d 949, 955-56 (Tenn. Crim. App. 1996); State v. Cooper, 736 S.W.2d 125, 129 (Tenn. Crim. App. 1987). "Constructive possession requires that a person knowingly have the power and the intention at a given time to exercise dominion and control over an object, either directly or through others. In essence, constructive possession is the ability to reduce an object to actual possession." State v. Copeland, 677 S.W.2d 471, 476 (Tenn. Crim. App. 1984). "'Possession' may be sole or joint; thus, more than one person can be considered

in possession of the same drugs." State v. Clyde Randall Scivally, No. M2001-02261-CCA-R3-CD, 2002 WL 1549063, at *2 (Tenn. Crim. App. July 15, 2002), perm. app. denied (Tenn. Dec. 30, 2002) (citing Copeland, 677 S.W.2d at 476).

We conclude that there was sufficient circumstantial evidence from which the jury could find that the Defendant constructively possessed the drugs and paraphernalia in the car. Multiple witnesses testified that the Defendant and Mr. McCollum were both recently in Ms. Pearson's car where the drugs were found. Ms. Pearson testified that Mr. McCollum told her that the Defendant drove the "good vehicle" back from Alabama, referring to her vehicle. The drugs were found in a duffle bag sitting in the back seat surrounded by camouflage clothing, and Ms. Pearson testified that the clothes in the duffle bag did not belong to Mr. McCollum. The Defendant had a large amount of cash on him, despite being unemployed.

The Defendant suggests a number of alternative theories for the ownership of the drugs in the car, arguing that the State must exclude every reasonable hypothesis other than that of his guilt. However, that is no longer the standard of review for circumstantial evidence; the standard "'is the same whether the conviction is based upon direct or circumstantial evidence.'" Dorantes, 331 S.W.3d at 379. The Defendant's reliance on Morelock v. State, 216 S.W.2d 5, 6-7 (Tenn. 1948) is therefore misplaced, as the court's analysis in that case appears to apply a higher standard for circumstantial evidence. In its province, the jury drew inferences from the evidence and determined that the circumstances were consistent with the Defendant's guilt. In the light most favorable to the State, the evidence is sufficient to sustain the Defendant's convictions.

## II. Prior Methamphetamine Use

Before the Defendant offered proof, the State indicated that it intended to ask his witnesses if they knew about the Defendant's prior use of methamphetamine. The Defendant argued that it would be improper character evidence, and the court ruled that the State could not ask the witnesses about the Defendant's prior methamphetamine use unless the Defendant opened the door to such questions.

Thereafter, the State asked one of the Defendant's witnesses, Jennifer Lee, if she was "taking anything today" to which Ms. Lee responded that she was simply tired and ready to go home. In a series of questions, the State asked Ms. Lee if she had used methamphetamine in her past, and she admitted that she used methamphetamine in 2009 and 2010. The Defendant did not object at any point during the State's cross-examination.

Later, before the State cross-examined Holly Melton, the prosecutor argued that the defense had opened the door to questions concerning the Defendant's prior drug use. The trial court disagreed and overruled the State's request to cross-examine Ms. Melton concerning the Defendant's prior drug use. On cross-examination, over a series of questions, Ms. Melton admitted that she had used methamphetamine in the past but said that it had been "a couple of years." The prosecutor noted that her answer meant that she last used methamphetamine around the time of the offense, but Ms. Melton clarified that her last use was before that time. The only objection by the defense during the cross-examination was that questions regarding the date Ms. Melton last used methamphetamine had been asked and answered.

The Defendant elected to testify and, during cross-examination, the State asked whether he was aware that either of these women had used methamphetamine in the past. The Defendant admitted to last seeing Ms. Melton use methamphetamine in his presence in 2009 or 2010. He also admitted to knowing that Ms. Lee used to use methamphetamine, although he said that he had "never been in her presence when she's using meth." The defense did not object to any questions by the State.

The Defendant argues that he was denied the right to a fair trial because the State's questioning about the prior methamphetamine use of defense witnesses came too close to a matter the trial court prohibited the State from discussing – the Defendant's prior use of methamphetamine. The Defendant, however, failed to object to any of the questions. As a general rule, this court does not consider issues that are not raised in the trial court. State v. Hoyt, 928 S.W.2d 935, 946 (Tenn. Crim. App. 1995). Moreover, the Defendant did not raise this issue in his motion for new trial. See Tenn. R. App. P. 3(e) (providing for waiver of issues not specifically stated in a motion for new trial); State v. Hatcher, 310 S.W.3d 788, 808 (Tenn. 2010) (stating that a defendant waives those issues not raised in a motion for new trial and those issues are subject to plain error review).

In order for us to find plain error: (a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is "'necessary to do substantial justice.'" State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). "[T]he presence of all five factors must be established by the record before [we] will recognize the existence of plain error, and complete consideration of all the factors is not necessary when it is clear from the record that at least one factor cannot be established." Id. at 283.

We discern no plain error in this case. We initially note that this court has stated that "rarely will plain error review extend to an evidentiary issue." State v. Ricky E.

<u>Scoville</u>, No. M2006-01684-CCA-R3-CD, 2007 WL 2600540, at *2 (Tenn. Crim. App. Sept. 11, 2007). Impeachment of witnesses on the basis of specific instances of conduct, such as the impeachment at issue here, is governed by Tennessee Rule of Evidence 608. Despite the Defendant's vague characterization of this as a due process issue, "an evidentiary ruling ordinarily does not rise to the level of a constitutional violation." <u>State v. Powers</u>, 101 S.W.3d 383, 397 (Tenn. 2003) (citing <u>Crane v. Kentucky</u>, 476 U.S. 683, 689 (1986)). Because this is merely an evidentiary issue, the Defendant has not established that any error adversely affected one of his substantial rights.

In addition, the State's questioning about prior methamphetamine use of defense witnesses did not affect the outcome of the trial such that consideration of the issue is "necessary to do substantial justice." Both Ms. Lee and Ms. Melton testified that they had not used methamphetamine in years. Although the Defendant argues that this questioning prejudiced him because the time the witnesses last used methamphetamine generally corresponded with a time when each witness knew the Defendant, this did not establish that the Defendant himself used methamphetamine. In fact, Ms. Lee claimed that she last used methamphetamine in 2009 or 2010, well before she dated the Defendant, and Ms. Melton denied that she was using methamphetamine around the time of the offense when the Defendant was living with her.

### III. Sentencing

The Defendant lastly argues that the seventeen-year-sentence imposed by the trial court is disproportionate to his conduct and, thus, "injure[s] the purpose[] of the Sentencing Reform Act." He bases this claim on his assertion that he was less culpable than his co-defendants, and they received lesser sentences via their plea agreements than to what he was sentenced.

A trial court is to consider the following when determining a defendant's sentence:

(1) The evidence, if any, received at the trial and the sentencing hearing;

(2) The presentence report;

(3) The principles of sentencing and arguments as to sentencing alternatives;

(4) The nature and characteristics of the criminal conduct involved;

(5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114;

(6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and

(7) Any statement the defendant wishes to make in the defendant's own behalf about sentencing.

Id. § 40-35-210(b).

The trial court is granted broad discretion to impose a sentence anywhere within the applicable range, regardless of the presence or absence of enhancement or mitigating factors, and the sentencing decision of the trial court will be upheld "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." State v. Bise, 380 S.W.3d 682, 709-10 (Tenn. 2012). Accordingly, we review the length of the sentences ordered by the trial court under an abuse of discretion standard, "granting a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." Id. at 707.

In determining the Defendant's sentences, the trial court first noted that the Defendant was a Range II offender and, as such, subject to a potential sentence of twelve to twenty years on the Class B felony convictions for aggravated kidnapping and possession of methamphetamine with intent to sell or deliver. He was subject to a potential sentence of four to eight years on the Class D felony conviction for facilitation of aggravated assault, and a sentence of eleven months, twenty-nine days on the Class A misdemeanor convictions for possession of oxymorphone and possession of drug paraphernalia.

The court found that the enhancement factor that the Defendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range applied, Tenn. Code Ann. § 40-35-114(1), given proof that the Defendant had approximately twelve other felony and thirty misdemeanor convictions. The court also found that the enhancement factor that the Defendant previously failed to comply with the conditions of a sentence involving release in the community applied, id. § 40-35-114(8), given prior violations of probation. The court further found that the evidence supported the application of the enhancement factor that the Defendant had no hesitation about committing a crime when the risk to human life was high. Id. § 40-35-114(10).

With regard to mitigating factors, the trial court found that the Defendant's releasing the victim alive applied in mitigation. Id. § 39-13-304(b)(2). The court reviewed the statutory mitigating factors proposed by the Defendant, including his asking

the court to take into account the sentences his more-culpable co-defendants received in their plea agreements, but the court found that none were applicable.

The court noted that, in arriving at its decision, it considered the evidence at trial and the sentencing hearing, the presentence report, the principles of sentencing, and the arguments of counsel. The court said that it considered the nature and characteristics of the Defendant's criminal conduct, the proof supporting the enhancement and mitigating factors, the Defendant's potential for rehabilitation, and the Defendant's cooperation reflected in the presentence report. Accordingly, the court imposed a sentence of seventeen years on the aggravated kidnapping conviction; six years on the facilitation of aggravated assault conviction; seventeen years on the two methamphetamine convictions, which merged; and eleven months, twenty-nine days on each of the misdemeanor drug convictions. The sentences were run concurrently for an effective term of seventeen years.

The record shows that the trial court properly considered the enhancement and mitigating factors and the principles and purposes of sentencing before imposing sentences within the applicable range for the Defendant's convictions. Therefore, the Defendant's sentences are presumed reasonable, and we affirm the trial court's judgments.

The Defendant's allegation of an unjust disparity between his and his co-defendants' sentences is without merit. The co-defendants pled guilty to lesser offenses than the offenses of which the Defendant was convicted, and the Defendant has an extreme criminal history whereas the criminal records of his co-defendants are not clear from the record. Moreover, the presumption of reasonableness prevails because the Defendant's sentences are within-range and "the record sufficiently reflects the trial court's consideration of the purposes and principles of sentencing." See State v. King, 432 S.W.3d 316, 321-22 (Tenn. 2014) (rejecting the Defendant's argument that her sentence was "disproportionate to those of her co-defendants, thereby violating the requirement [that courts] . . . 'eliminat[e] unjustified disparity in sentencing'").

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____
ALAN E. GLENN, JUDGE